IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

ALBERT BELL                                                    PETITIONER
ADC #104487

V.                                NO. 5:05cv00084 JMM-JWC

LARRY NORRIS, Director,                                        RESPONDENT
Arkansas Department of Correction

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
## INSTRUCTIONS

The following recommended disposition has been sent to United States District

Court Judge James M. Moody.  Any party may serve and file written objections to this

recommendation.  Objections should be specific and should include the factual or legal

basis for the objection.  If the objection is to a factual finding, specifically identify that

finding and the evidence that supports your objection.  An original and two copies of your

objections must be received in the office of the United States District Court Clerk no later

than eleven (11) days from the date of the findings and recommendations.  The copy will

be furnished to the opposing party.   Failure to file timely objections may result in waiver

of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different,

or additional evidence, and to have a hearing for this purpose before the District Judge,

you must, at the same time that you file your written objections, include the following:

1.    Why the record made before the Magistrate Judge is inadequate.

2.    Why the evidence proffered at the hearing before the District Judge  (if such
      a  hearing is granted)  was not  offered at  the hearing before the Magistrate
      Judge.

3.    The detail of any testimony desired to be introduced at the hearing before
      the District Judge in the form of an offer of proof, and a copy, or the original,

of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite 402
Little Rock, AR 72201-3325

## RECOMMENDED DISPOSITION

Albert Bell, an Arkansas Department of Correction inmate, brings this 28 U.S.C. § 2254 petition for writ of habeas corpus (docket entry #2). Respondent concedes (docket entry #12) that Petitioner is in his custody, *see id.* § 2254(a), but asserts that the petition should be dismissed for several reasons. Petitioner has replied (docket entries #15, #20). For the reasons that follow, the petition should be **dismissed in its entirety**.

I.
Background

According to statements given to police, Petitioner and Terry Sims entered Cloud's Grocery Store in Casscoe, Arkansas, on December 15, 1992. Sims returned a movie while Petitioner asked employee Julian Russell if he had any fuses. While Russell was looking for fuses, Sims shot him approximately five times. Another employee, Mary Lou Jones, began screaming and, after Petitioner got the money from the cash register, Sims shot Jones twice. Petitioner and Sims then went to Sims' car and drove to a friend's house.

2

Petitioner and Sims were both charged with capital murder for the deaths of Russell and Jones.  (Resp't Ex. 1, at 1.)[1]  Petitioner, who was sixteen at the time of the offense, filed a motion to transfer his case from the Arkansas County Circuit Court to juvenile court. The circuit court held an evidentiary hearing, then entered an order denying transfer.  (*Id.* at 4, 215-262.)  Petitioner took an interlocutory appeal to the Arkansas Supreme Court, which affirmed the denial.  *Bell v. State*, 877 S.W.2d 579 (Ark. 1994) (*Bell I*).

Petitioner's case proceeded in the circuit court where, in September 1994, he was tried before a jury on the charges.  He was convicted of two counts of first-degree murder and sentenced to two consecutive life sentences.  (Resp't Ex. 1, at 205.)  He appealed, and the Arkansas Supreme Court remanded the case for a new suppression hearing with regard to Petitioner's custodial statements because a material witness was not present at the pretrial hearing held in the circuit court.  *Bell v. State*, 920 S.W.2d 821 (Ark. 1996) (*Bell II*).  On remand, the circuit court granted Petitioner's motion to suppress and ordered a new trial.  This time, the state appealed, and the Arkansas Supreme Court reversed, holding that the circuit court erred in suppressing Petitioner's statement and, therefore, affirming his convictions and sentences.  *Bell v. State*, 948 S.W.2d 557 (Ark. 1997) (*Bell III*).[2]

On August 27, 1997, Petitioner filed a timely petition for state post-conviction relief pursuant to Ark. R. Crim. P. 37, which he later amended.  (Resp't Ex. 6,[3] at 7-23, 142-67.)

---

[1]The records of Petitioner's state court proceedings have been submitted as exhibits to docket entry #19.  Resp't Ex. 1 is the 17-volume record of his pretrial and trial proceedings, as reviewed in his direct appeal (Ark. Sup. Ct. No. CR 95-417).

[2]Resp't Ex. 3 is the three-volume record of the circuit court proceedings following remand, as reviewed in the state's appeal (Ark. Sup. Ct. No. CR 96-1543).

[3]Resp't Ex. 6 is the four-volume record of Petitioner's Rule 37 post-conviction proceedings, as reviewed in his post-conviction appeal (Ark. Sup. Ct. No. CR 02-1071).

After an evidentiary hearing, the circuit court denied relief. *State v. Bell*, No. CR-1993-4 (Ark. Co. Cir. Ct. Mar. 6, 2002) (Resp't Ex. 6, at 249-52). Petitioner filed a notice of appeal (Resp't Ex. 6, at 259), but failed to tender the lower court record within ninety days as required by the applicable appellate rules. Ark. R. App. P.-Crim. 4(a); Ark. R. App. P.-Civ. 5(a) (2002). He filed a motion for rule on the clerk to lodge the record belatedly, which was granted. *Bell v. State*, 88 S.W.3d 425 (Ark. 2002). On May 13, 2004, the Arkansas Supreme Court affirmed the denial of post-conviction relief, rejecting Petitioner's claims on the merits. *Bell v. State*, No. CR 02-1071, 2004 WL 1068724 (Ark. Sup. Ct. May 13, 2004) (unpub. op.) (*Bell IV*). There is no evidence or allegation that he sought any further relief in state court.

Petitioner now brings this federal habeas petition, advancing the following claims:

> 1. The Arkansas Supreme Court's decision finding the Arkansas Juvenile Code inapplicable was unreasonable in light of the evidence presented in the state court proceedings;

> 2. The Arkansas Supreme Court's decision finding that Petitioner knowingly and intelligently waived his *Miranda*[4] rights and his Fifth and Sixth Amendment rights was contrary to or involved an unreasonable application of clearly established federal law;

> 3. The Arkansas Supreme Court's decision finding that counsel was not ineffective for failing to make certain arguments in support of suppression of Petitioner's statements, was contrary to or involved an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings;

> 4. The Arkansas Supreme Court's decision that counsel was not ineffective for failing to object to the responses given by three jurors when polled about their verdict, was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings; and

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

5.    The Arkansas Supreme Court's decision that counsel was not ineffective for waiving Petitioner's statutory right to have the jury's questions addressed by the trial judge in the courtroom, was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Respondent asserts that the petition should be dismissed for several reasons: (1) as barred by the one-year statute of limitations for federal habeas petitions as set forth in 28 U.S.C. § 2244(d); (2) as presenting in Ground 1 a claim that is procedurally defaulted because Petitioner failed to fairly present it to the state courts; (3) as presenting only a question of state law in Ground 1; and (4) with respect to Grounds 2, 3, 4 and 5, as failing to demonstrate entitlement to federal habeas relief under the statutes requiring deferential review of state court decisions.

II.
Statute of Limitations

Respondent first contends that the entire petition is time-barred under 28 U.S.C. § 2244(d)(1), which requires that a federal habeas petition be filed within one year of the date upon which a state judgment of conviction became final.  Petitioner's convictions became final in October 1997, and he filed this petition more than seven years later, in March 2005.  *See Curtiss v. Mount Pleasant Corr. Facility*, 338 F.3d 851, 853 (8th Cir. 2003) (state judgment becomes final upon conclusion of all direct criminal appeals in state court, followed by expiration of ninety-day period for filing a petition for writ of certiorari with the United States Supreme Court).  However, the time during which a properly filed state post-conviction proceeding is pending does not count toward the one-year limitations period.  28 U.S.C. § 2244(d)(2).  Petitioner was involved in state post-conviction proceedings from August 27, 1997, to May 13, 2004.  Whether the federal statute of

limitations was tolled during that entire period raises some complicated questions, for which there is no clear answer in the statute or in current case law.  *See Lewis v. Norris*, 454 F.3d 778, 779-80 (8th Cir.) (for the fourth time, alluding to but declining to resolve issues regarding how Arkansas' belated appeal provisions interact with the federal habeas statute of limitations), *cert. denied*, 127 S. Ct. 515 (2006); *Collier v. Norris*, 402 F. Supp. 2d 1026, 1030-31 (E.D. Ark. 2005) (Rule 37 post-conviction proceeding remained "pending," thereby tolling federal limitations period, even though time for filing appellate record had expired, where Arkansas Supreme Court later accepted the record despite untimeliness), *aff'd*, 485 F.3d 415, 426-27 (8th Cir. 2007) (affirming dismissal of federal habeas petition on other grounds without reaching timeliness issue).

Because the statute of limitations defense is not jurisdictional, the Court will, therefore, proceed to Respondent's alternative arguments in the interest of judicial economy.  *Day v. McDonough*, 126 S. Ct. 1675, 1681 (2006); *Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir.), *cert. denied*, 127 S. Ct. 583 (2006).

III.
Ground 1

Petitioner's first claim is that the Arkansas Supreme Court's decision finding the Arkansas juvenile code inapplicable was unreasonable in light of the evidence presented in his state court proceedings.  Respondent argues: (1) that this claim is procedurally defaulted  because it was not presented in the state circuit court and on appeal; and (2) that it presents only questions of state law, which are not reviewable in federal habeas proceedings.

A.     <u>State Court Proceedings and Decision</u>.

The record shows that, after being charged in circuit court with the two murders at issue, Petitioner's counsel filed a motion to transfer his case to juvenile court. Following an evidentiary hearing on November 22, 1993, the circuit court denied transfer, stating that it had reached its conclusion after applying the criteria set forth in Ark. Code Ann. § 9-27-318 to the facts of Petitioner's situation. (Resp't Ex. 1, at 4.) In affirming the denial, the Arkansas Supreme Court held that, even though there was no proof that Petitioner personally committed a violent act, denial of transfer to juvenile court was proper due to the serious and violent nature of the offenses with which Petitioner and his co-defendant were charged, and because an accomplice is responsible for the activities of his cohort. *Bell I*, 877 S.W.2d at 581. The supreme court noted testimony indicating that Petitioner acted as a decoy to lure one of the victims away from the cash register during the course of the robbery, he took money from the cash register, he told investigators where to retrieve the murder weapon, his co-defendant had given a statement implicating Petitioner, and Petitioner had given statements to the police which proved to be false. *Id.*

B.     <u>Petitioner's Argument</u>.

In support of his claim under Ground 1, Petitioner asserts that, at the time he was taken into custody and transported to the police station for questioning on January 8, 1993, he was sixteen years old, had been previously adjudicated a juvenile delinquent and placed on juvenile probation, and thus "enjoyed the protection of the Arkansas Juvenile Codes." He asserts that state authorities failed to comply with certain statutory provisions regarding juvenile transfer hearings and interrogation of juveniles, specifically referring to: (1) the requirement under Ark. Code Ann. § 9-27-313(b) that, upon being taken into

7

custody, a juvenile must be taken immediately before the court from which the warrant issued, with that court deciding whether jurisdiction lies in juvenile or circuit court; (2) the requirement under § 9-27-316 that a juvenile and his parent, guardian or custodian must be advised upon being taken into custody, at the initial intake interview, and at the first court appearance, of the right to be represented by counsel; and (3) the requirement under § 9-27-317(b), (c) and (f) that a juvenile's waiver of the right to counsel must include the written agreement of the juvenile and his parent, guardian or custodian.   Petitioner contends that denial of these protections violated his rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution, and his right to protection against self-incrimination under the Fifth Amendment.  (*See* docket entries #2, at 4-6; #20, at 3-4.)

    C.    <u>Analysis</u>.

    Before seeking federal habeas review, a state prisoner must first fairly present the substance of each claim to each appropriate state court, thereby alerting those courts to the federal nature of his claims and giving them an opportunity to pass upon and correct any constitutional errors made there.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *see* 28 U.S.C. § 2254(b) & (c) (requiring federal habeas petitioner to exhaust all remedies available in the state courts).   Presentation of a state law basis for his claims, but no federal constitutional arguments, is insufficient.  *Carney v. Fabian*, 487 F.3d 1094, 1096-97 (8th Cir. 2007).   If a petitioner has not presented his federal habeas claim to the state courts, the claim is, generally, procedurally defaulted.  *Id.*; *see Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (habeas review of procedurally defaulted claims is barred unless petitioner shows "cause" for default and "actual prejudice" from the alleged violation of

federal law, or demonstrates that failure to consider the claims will result in a "fundamental miscarriage of justice")

Petitioner says the juvenile code violations are "numerous, blatant, and deliberate" and "facially apparent" from looking at the state court record.  He says that his attorney raised the juvenile issues through the questions he asked witnesses at the transfer hearing, and that the Arkansas Supreme Court had an affirmative obligation to review those issues due to his life sentence pursuant to Ark. Code Ann. § 16-91-113(a).[5] However, nothing in the state court records submitted here establishes that Petitioner presented – at his transfer hearing in the circuit court, or in his interlocutory appeal to the Arkansas Supreme Court – any reference to or legal arguments regarding the particular juvenile code provisions he now cites, much less any claims arising under the United States Constitution.  As a general matter, a state prisoner has the burden of raising a federal claim in the state courts even if the state court could have identified and addressed the federal question without its having been raised.  *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Baldwin*, 541 U.S. at 32 (federal claim not "fairly presented" if state court must read beyond prisoner's petition or brief to find material alerting court to federal claim).

The record does show that, in his direct appeal to the Arkansas Supreme Court following conviction, Petitioner argued that his custodial statements should have been suppressed because, among other things, no written waiver of his right to counsel was signed by either of his parents, as required by § 9-27-317.  (Resp't Ex. 2, at 680-82.) However, the Arkansas Supreme Court did not reach this specific issue because it

---

[5]This statute provides, "The Supreme Court need only review those matters briefed and argued by the appellant, except that where either a sentence for life imprisonment or death has been imposed the Supreme Court shall review all errors prejudicial to the rights of the appellant."

remanded the case for a new suppression hearing on another basis. *Bell II*, 920 S.W.2d at 823. No references to the juvenile code provisions appear in the circuit court's new suppression ruling (Resp't Ex. 3, at 100-03), Petitioner's appellate brief (Resp't Ex. 5), or the Arkansas Supreme Court's later decision finding the statements admissible, *Bell III*, 948 S.W.2d at 560-63.

Even if, as Petitioner contends, the state courts improperly "overlooked" the alleged violations, his current claims would not entitle him to federal habeas relief. In reviewing a habeas petition, this Court is limited to deciding whether a conviction has violated the Constitution, laws or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a) & (d); *see Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The Court lacks authority to review a state court's interpretation and application of state law, for "federal habeas corpus relief does not lie for errors of state law ... [and] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* Therefore, it is not enough for Petitioner to argue that the Arkansas state courts misapplied any provisions of state law. *Evenstad v. Carlson*, 470 F.3d 777, 783 (8th Cir. 2006). In *Bell I*, the Arkansas Supreme Court affirmed the circuit court's holding that, after considering the statutory provisions of § 9-27-318, transfer to juvenile court was not appropriate. To the extent Petitioner is challenging that decision, this interpretation of state law is binding here. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); *Ford v. Norris*, 364 F.3d 916, 919 (8th Cir. 2004) ("As the supreme judicial authority of the state, [the Arkansas Supreme Court] decides what state law is, an issue which cannot itself be reviewed in a federal habeas proceeding.").

Similarly, the Arkansas courts have repeatedly held that the statutory protections regarding a juvenile's waiver of his right to counsel do not apply to juveniles who are charged as adults. *Ray v. State*, 40 S.W.3d 243, 246-50 (Ark. 2001); *Boyd v. State*, 853 S.W.2d 263, 264-65 (Ark. 1993). Again, this interpretation of state law is binding on federal habeas courts.

To the extent that the state courts decided any federal constitutional issues adversely to Petitioner, the scope of federal habeas review is limited to whether that adjudication (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); **or** (2) "involved an unreasonable application" of clearly established federal law, *id.*; **or** (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

In *Kent v. United States*, 383 U.S. 541 (1966), the United States Supreme Court held that the waiver of juvenile court jurisdiction to permit criminal prosecution as an adult "is a 'critically important' action determining vitally important statutory rights of the juvenile." *Id.* at 556. While a juvenile is not entitled to all the constitutional guarantees that attend a criminal trial, any waiver proceeding must comport with "procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness." *Id.* at 553. *See also In re Gault*, 387 U.S. 1 (1967) (holding that the United States Constitution guarantees a juvenile timely notice of his hearing, a right to counsel, an opportunity to be heard, a right to confront witnesses, and a privilege against self-incrimination). However, while *Kent* and *Gault* mandate procedural safeguards for juveniles, the Supreme Court "has never attempted to prescribe criteria for, or the nature

11

and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court." *Breed v. Jones*, 421 U.S. 519, 537 (1975).

Here, the state circuit court held a hearing at which Petitioner was present and represented by counsel.  (Resp't Ex. 1, at 215-262.)  He presented three witnesses[6] and also testified in his own behalf.  The court was made aware of Petitioner's age at the time of the charged offenses, his previous involvement in livestock theft which resulted in his being placed on juvenile probation, his psychological/mental condition and amenability to rehabilitation, the serious and violent nature of the charged offenses, and the extent of his alleged involvement in the crimes.  No allegation is made of any procedural irregularities in the hearing itself.  Under *Breed*, any evaluation and judgment as to the weight given to the evidence presented is a matter of state law, not cognizable under federal habeas proceedings.  The applicable Arkansas law clearly holds that involvement in a serious violent offense, even where the defendant did not personally use a weapon, is a sufficient basis for trying a juvenile as an adult.  *Thompson v. State*, 958 S.W.2d 1, 2 (Ark. 1997); *Guy v. State*, 916 S.W.2d 760, 763 (Ark. 1996); *Walker v. State*, 803 S.W.2d 502, 506 (Ark. 1991).  In any event, the evidence presented to the state court at the transfer hearing was not so insufficient as to rise to the level of a due process violation.

Because no United States Supreme Court case addresses the sufficiency of the evidence to support a denial of transfer to juvenile court, Petitioner has not established that the Arkansas Supreme Court's rejection of his claim was contrary to or an unreasonable

---

[6]A psychologist, the sheriff, and the Arkansas State Police investigator who was in charge of investigating the homicides.

application of clearly established federal law, or was based on an unreasonable determination of the facts.

Additionally, no United States Supreme Court case dictates the additional protections afforded by state law for juveniles who waive their right to counsel during the interrogation process.  As discussed in the next section, the constitutional requirements of *Miranda*, regarding the validity of a waiver of a suspect's rights, do not apply differently to juveniles than they do to adults.  *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  Therefore, the alleged failure of state authorities to comply with the specified provisions cannot amount to a federal constitutional violation in and of itself.

Ground 1 should be dismissed.

IV.
Ground 2

Petitioner's next argument is that the Arkansas Supreme Court's decision finding that he validly waived his *Miranda* rights and his Fifth and Sixth Amendment rights was contrary to or involved an unreasonable application of clearly established federal law. Respondent contends that this claim fails to demonstrate entitlement to federal habeas relief under the statutes requiring deferential review of state court decisions.

A.      State Court Proceedings and Decision.

Before trial, Petitioner filed a motion to suppress his custodial statements, and the circuit court conducted a suppression hearing in August 1994, denying the motion. (Resp't Ex. 1, at 70-73, 263, 375-487.)  As stated, the Arkansas Supreme Court remanded the case for a new suppression hearing.  *Bell II*, 920 S.W.2d at 822-23.  Petitioner filed an

amended motion to suppress, and a second hearing was held in October 1996.  (Resp't Ex. 3, at 83-84, 108-435.)[7]

At the second hearing, John McCord, who was the lead investigator for the Arkansas State Police regarding the homicides at issue, was called to the stand three separate times.  (*Id.* at 115-182, 259-263, 314-340.)  He testified that he first spoke with Petitioner, who was sixteen, on January 5, 1993.  He said that on that day, he and another officer waited at the Stuttgart High School for Petitioner to be dismissed from class.  He said he had told Petitioner in the principal's office earlier that he did not have to go to the sheriff's department with them and that Petitioner had agreed to go after school.  When school was out, the police officers called Petitioner and Sims over to an unmarked police car and placed them in the back seat.  They then drove the two young men to the sheriff's department for questioning.  After leaving the high school, McCord did not tell Petitioner again that he was free to leave.

Petitioner's interview at the sheriff's office took about thirty minutes and his mother was with him during the interview.  McCord testified that Petitioner was being questioned as a witness, not a suspect, and was free to leave.  He admitted that Sims left the sheriff's department during this time and was chased by police officers.  It was later revealed that Sims returned on his own.  McCord testified that he did not read Petitioner his *Miranda* warnings at this time because he was not a suspect.  Rather, McCord said he questioned Petitioner because the investigation had begun to focus on Sims, and because Petitioner was a friend of Sims and had been seen out that night about the time of the murders.

_____

[7]A different circuit judge was appointed to conduct the second suppression hearing.  (Resp't Ex. 3, at 108-09.)

Petitioner denied being with Sims on the night of the murders.  McCord testified that the investigation had begun to focus on Sims because he had given inconsistent times as to when he returned a videotape to Cloud's Grocery Store.  McCord also stated that the father of a friend of Sims was missing a .22 caliber revolver, which appeared to be the type of gun used in the murders.

McCord testified that, on January 7, Petitioner's brother (Eddrick Bell) told police that Sims had picked up Petitioner at about 7:00 p.m. on the night of the murders. Because this was inconsistent with Petitioner's January 5 statement, it was determined that further questioning of Petitioner was warranted.

Deputy Sheriff David Box testified that he was instructed, on January 8, 1993, to locate Petitioner and ask him to accompany the officer to the sheriff's department for further questioning.  Box and another officer found Sims and Petitioner at Petitioner's grandmother's house, but they were not placed under arrest or handcuffed.  Box testified that if the two young men had refused to go with him, he would have radioed the sheriff for instructions.  He admitted that he did not tell Sims and Petitioner that they did not have to accompany him, but he said that Petitioner never said he did not want to go.  (*Id.* at 286-295.)

McCord testified that he interviewed Petitioner a second time at the sheriff's department on January 8, but this time he was considered a suspect.  He testified that, on January 8, Petitioner agreed to speak with him, that he advised Petitioner of his *Miranda* rights at that time, that Petitioner verbally acknowledged he understood each *Miranda* right as it was read to him, and that Petitioner then initialed the separate *Miranda* warnings and signed the waiver of rights form, acknowledging that he understood his rights and knew

15

what he was doing.  (*See* Resp't Ex. 3, at 428.)  According to McCord, the process lasted about five minutes.  In the first statement taken from Petitioner on January 8, he repeatedly denied that he was with Sims on the night of the murders.  However, when confronted with Petitioner's brother's statement placing him with Sims that night, Petitioner admitted that he had been with Sims and had accompanied him to Cloud's Grocery Store.  He further told the interrogating officers that he sat in the car and saw Jeanette Gillmore shoot Julian Russell in the grocery store and that Sims ran out of the store while the shooting was in progress.

McCord testified that Petitioner never asked to stop the questioning or to terminate the interview on January 8, and that he never asked for a lawyer.  He estimated that he talked with Petitioner for an hour or less.  McCord testified that no threats, force or coercion was used by any officer and that the interview was "very calm."  After McCord completed his interview, Petitioner was turned over to State Police Investigator John Howell for a polygraph examination.

Howell testified at the suppression hearing that Petitioner agreed to take the polygraph exam.  Petitioner and his father, Prince Bell, signed a "Polygraph Release Form" stating that Petitioner was voluntarily submitting to the exam.  (*Id.* at 216-17, 435.)  Howell said he did not utilize any force, intimidation or threats.  He said he inquired about Petitioner's statement that Jeanette Gillmore had done the shooting, but said the polygraph test showed Petitioner was being deceptive with his answers.  Petitioner told Howell he would tell the truth if allowed to speak with Sims first.  He was told that he could talk to Sims only after he told the truth.  Petitioner then told Howell that Sims shot the victims: "Terry just lost it and started shooting."  Petitioner wanted to make a plea at that time, and

Howell informed him that only the prosecuting attorney had the authority to agree to a plea. Petitioner was allowed to speak with Sims, and he told Sims that he was going to tell the truth "regardless of what Terry had to say."  Sims then agreed to tell the truth, and he confessed to shooting the two victims.  Petitioner told Howell that he (Petitioner) had thrown the gun in a pond, drew a map showing him the location, and later took officers there.  (*Id.* at 223-258, 430-434.)

McCord had first testified that he did not believe he had probable cause to arrest Petitioner on January 8, 1993.  When he retook the stand at a later time, he testified that it was "borderline" but he thought there was probable cause to arrest on January 8.

Arkansas State Police Sergeant Gary Allen testified that he "sat in" on the January 8 interrogation with McCord and witnessed Petitioner's signing of the rights-waiver form. He said he did not conduct the interview, and he denied threatening or coercing Petitioner to make a statement, displaying any force, or raising his voice.  He did admit to telling Petitioner that he was lying.  He also said he asked Petitioner at various times if he needed to go to the restroom, needed anything to eat or drink, or needed to talk to one of his parents.  He testified that Petitioner never asked for an attorney, never asked to speak to his parents, and never asked to leave.  (*Id.* at 201-221.)

Petitioner's parents testified at the suppression hearing, stating that they were excluded from the January 8 interview and heard "hollering," "loud talking" and several noises like someone beating on the wall or hitting a desk.  (*Id.* at 354-376.)  Petitioner also testified, (*id.* at 377-422), denying that he knew what a *Miranda* right was at the time of the interview.  He admitted that he had a juvenile offender history but denied that he had ever been read his *Miranda* rights previously.  He stated that he had since learned of his rights

17

in prison.  Petitioner admitted that McCord read him his rights on January 8, but he stated that McCord did not explain what those rights meant.  Petitioner said he initialed the paragraphs on the waiver form and signed it because he was told to do so.  He further stated that he requested an attorney.  He said he did not think he could leave on January 8 because the police officers had chased Sims when he left the sheriff's department on January 5.

On cross-examination, Petitioner admitted that he was told he had the right to remain silent, but said he felt compelled to answer the questions that were being asked. He further testified that he had heard *Miranda* warnings read in television programs but said he did not understand them.  Petitioner admitted that he did not ask for an explanation of his rights.  He also indicated that at least some of his rights had been explained to him as a juvenile.  Petitioner added that while he understood the words of the warnings, he did not understand what they meant.

The circuit court entered its order on October 21, 1996, concluding: (1) that, by failing to inform Petitioner that he did not have to accompany them, police officers failed to comply with Ark. R. Crim. P. 2.3[8] when they picked him up from high school for questioning on January 5; (2) that the officers did not advise Petitioner of his *Miranda* rights on January 5; (3) that police officers did not comply with Rule 2.3 when they picked up Petitioner for questioning on January 8; (4) that the officers did not have probable cause to arrest him on January 8; and (5) that the record did not reflect any effort taken by the state to comply with Rule 2.3 nor any efforts by the state to determine whether the waiver

---

[8]Rule 2.3 states: "If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request."

executed by Petitioner was made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.  However, the court agreed that Petitioner had acknowledged that he understood his rights when they were read to him.  The court suppressed the statements made by Petitioner on both January 5 and January 8, 1993.  (Resp't Ex. 3, at 100-03.)

The state appealed, contending that Petitioner had read and understood his *Miranda* rights on January 8 and that the circuit court clearly erred in ruling otherwise.[9] The state argued that it was not required to make any special or additional effort to assess Petitioner's ability to understand his rights and the consequences of a waiver.  (*See* Resp't Ex. 4.)  The Arkansas Supreme Court agreed:

> It was undisputed that Bell had been read his *Miranda* rights prior to giving the statement on this date.  Bell also had some familiarity with the criminal justice system due to the fact that he had previously been on probation as a juvenile offender.  In fact, he knew that as a juvenile, he was entitled to have his parents or a lawyer present when being questioned.  He was age 16 and a high school sophomore who was taking regular courses in math, science, and English, though he had also been in remedial classes since the fourth grade.  He further agreed that he understood the words in his warnings but denied knowing their import.

> A defendant's waiver of Fifth and Sixth Amendment rights must be knowing and intelligent with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Clay v. State*, 883 S.W.2d 822 ([Ark.] 1994); *Mauppin v. State*, 831 S.W.2d 104 ([Ark.] 1992).  We analyze the issue of a knowing and intelligent waiver under the test of totality of the circumstances.  *See Humphrey v. State*, 940 S.W.2d 860 ([Ark.] 1997); *Bradford v. State*, 927 S.W.2d 329 ([Ark.] 1996).  Bell was 16 at the time of his confession.  He was in the 10th grade and apparently on track to graduate from high school.  Moreover, he had some experience with the criminal justice system, and he initialed each of his

---

[9]The Arkansas Supreme Court also disagreed with the circuit court's finding that Petitioner's statements should be suppressed due to a violation of Ark. R. Crim. P. 2.3.  *Bell III*, 948 S.W.2d at 560-62.  Here, Petitioner does not contest the appellate decision in this regard.

*Miranda* rights after reading them.  He further agreed that he knew what the words meant.

Balanced against these factors is Bell's self-serving statement that he did not realize the consequences of a waiver.  He also contends that he requested counsel, which partially flies in the face of his contention that he did not understand his *Miranda* rights.  While it is true that we defer to the trial court's assessment of credibility [*State v. McFadden*, 938 S.W.2d 797 (Ark. 1997)], here the trial court provides no insight as to why it found that Bell did not understand the consequences of what he was doing.  Indeed, the factors clearly preponderate in favor of a knowing and intelligent waiver. The mere statement of the accused that he did not comprehend a waiver's significance is not enough in light of his statement that he understood the words and his acknowledgment to the officers that he understood his rights. We hold that the trial court clearly erred in suppressing the statement of Bell on this basis.

*Bell III*, 948 S.W.2d at 562 (footnote & parallel citations omitted).

B.    Governing United States Supreme Court Law.

Clearly established federal law holds that, prior to initiating a custodial interrogation, the police must protect a suspect's Fifth Amendment privilege against self-incrimination by warning him that the state intends to use any statements to secure a conviction and that he has the right to remain silent and to have counsel present if he so desires.  *Miranda*, 384 U.S. at 444, 478-79.  A suspect's waiver of those rights is valid only if made (1) voluntarily and (2) knowingly and intelligently.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986). (*Miranda* waiver inquiry has "two distinct dimensions").  A waiver is voluntary if it "was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it is knowing and intelligent if made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*  The totality of the circumstances must be examined in determining whether a waiver was voluntary and whether a suspect had the requisite level of comprehension to knowingly and

intelligently waive his rights. *Id.* The totality-of-the-circumstances approach is appropriate even where the interrogation of juveniles is involved. *Fare*, 442 U.S. at 725.

     C.    <u>Petitioner's Argument</u>.

Liberally construing his filings here, Petitioner contends that his waiver of his *Miranda* rights was neither "voluntary" nor "knowing and intelligent" and that the Arkansas Supreme Court's decision holding otherwise is contrary to and an unreasonable application of federal law, and is based on an unreasonable determination of the facts in the light of the evidence presented at the suppression hearing. He says the record shows his will was overborne by psychological coercion, intimidation and deception. He says the coercion began on January 5, when he saw the detectives chasing Sims as he tried to leave during interrogation, then continued on January 8, when he was snatched from his grandmother's house, placed in the back seat of a squad car by two fully uniformed officers brandishing weapons, and transported to the sheriff's station. He says that, at the station, he was immediately placed in an interrogation room and isolated from all outside support. He says he had only one previous encounter with law officials and that was with parental supervision. He says no officer attempted to make sure that he fully understood his *Miranda* rights and the consequences of a waiver. He says the process took less than five minutes and he followed all instructions and offered no resistance. He says the officers constantly told him he was lying and confronted him with other witnesses' statements, yelled at him, and would not allow his parents to witness the interrogation or offer psychological support. He says that, when he was not allowed to see his parents, he asked for an attorney, which was denied. He says he was never told he was free to leave, and the officers were wearing their weapons. He contends that, based on the totality of

the circumstances surrounding the interrogation, the Arkansas Supreme Court's holding that he voluntarily, knowingly and intelligently waived his rights is unreasonable and contrary to settled authority and not entitled to deference on habeas review. He thus argues that his federal constitutional rights were violated and his custodial statements should have been suppressed. (*See* docket entries #2, at 6-10; #20, at 5-10.)

D.   Procedural Default.

Petitioner's initial motion to suppress argued that his rights-waiver was neither voluntary nor knowing and intelligent, in violation of state law and his federal constitutional rights. (Resp't Ex. 1, at 70-73.) At the first suppression hearing, his arguments focused on the lack of *Miranda* warnings before the January 5 interview and before the polygraph exam. (*Id.* at 451-52, 486.) In his testimony, Petitioner stated at least eleven times that he had asked for an attorney. (*Id.* at 456-60, 462-63.) The circuit court summarily denied the motion without making any specific findings. (*Id.* at 487.) In Petitioner's direct appeal, the Arkansas Supreme Court did not reach the merits of his claim that his custodial statements should have been suppressed because it remanded for a new suppression hearing. *Bell II*, 920 S.W.2d at 823.

Petitioner's subsequent amended motion to suppress argued that he did not "knowingly, intelligently or voluntarily" waive his rights, that interrogation continued after he requested counsel, that he was not allowed to consult with an attorney or his parents, that Ark. R. Crim. 2.3 was not complied with, and that his federal constitutional rights were violated. (Resp't Ex. 3, at 83-84.) At the second suppression hearing, his arguments were that Rule 2.3 was violated, no *Miranda* warnings were given before the January 5 interview or the polygraph exam, he was denied the right to an attorney, he did not knowing and

22

intelligently waive his rights on January 8, all in violation of the Fourth, Fifth and Sixth Amendments. (*Id.* at 295-301, 305-09.)  As stated, the circuit court granted relief on the Rule 2.3 and knowing-and-intelligent issues and did not make specific findings on the other issues, and Petitioner did not ask for a specific ruling.  In the state's appeal, Petitioner argued that the suppression motion was properly granted, setting out the general case law that a waiver must be both voluntary and knowing and intelligent, but he did not cross-appeal the lack of a ruling on any issue.  (Resp't Ex. 5, at 10-11.)  The Arkansas Supreme Court's decision only addresses the knowing-and-intelligent facet of the waiver issue, obviously because that was how the issue was framed by the circuit court's order and the state's appellate brief.  The supreme court noted that the issue of whether Petitioner requested counsel was not addressed below and was not presented in the appeal.  *Bell III*, 948 S.W.2d at 562 n.1.

Respondent does not argue that the voluntariness or counsel-request issues are procedurally defaulted and, because of the unusual procedural history, this Court will address the merits of both dimensions of the waiver inquiry and, to a limited extent, his allegations that he requested counsel.[10]

E.   <u>Analysis</u>.

Although citing state cases, the law cited and standards applied by the Arkansas Supreme Court on the knowing-and-intelligent issue are consistent with the applicable

---

[10]Whether Petitioner requested counsel is relevant only as a component of his voluntariness argument and is not raised as an independent constitutional claim.  *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that, once a suspect asserts his right to counsel, police must cease all interrogation until the witness has consulted with counsel or the suspect subsequently waives his right to counsel); *Miranda*, 384 U.S. at 444-45 (if suspect indicates that he wishes to consult with an attorney before speaking, there can be no questioning).

United States Supreme Court precedents.[11]   *See Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (it is not necessary for the state court to cite, or even be aware of, applicable United States Supreme Court opinions as long as "neither the reasoning nor the result of the state-court decision contradicts them").   Neither party contends that the United States Supreme Court has addressed a case with facts that are "materially indistinguishable" from those involved here.   Therefore, the state supreme court's decision regarding this aspect of Petitioner's waiver was not "contrary to" applicable United States Supreme Court law under § 2254(d)(1).   *See Williams v. Taylor*, 529 U.S. 362, 405-06, 412-13 (2000) (state court decision is "contrary to" federal law if it applies a rule that contradicts the controlling Supreme Court authority or if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a Supreme Court case, but nonetheless reaches a different result).

Furthermore, as explained below, the state supreme court's decision, viewed objectively, did not unreasonably apply those federal constitutional principles to the facts of Petitioner's case.   *Id.* at 409, 413 (state court's decision involves "unreasonable application" of federal law under § 2254(d)(1) if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case"; habeas court must ask whether state court's application was "objectively unreasonable").

---

[11]The cases cited by the Arkansas Supreme Court can be quickly traced back to the relevant United States Supreme Court decisions.  *Bell III*, 948 S.W.2d at 562, citing *Clay v. State*, 883 S.W.2d 822, 825-26 (Ark. 1994) (citing *Moran* and *Fare*); *Mauppin v. State*, 831 S.W.2d 104, 109-10 (Ark. 1992) (citing *Miranda, Moran*, and *Fare*); *Humphrey v. State*, 940 S.W.2d 860, 863-64 (Ark. 1997) (citing *Moran*).

As stated, the United States Supreme Court has directed utilization of the "totality of the circumstances" approach in determining whether there has been a knowing and intelligent waiver, even where interrogation of juveniles is involved. *Fare*, 442 U.S. at 725. This approach mandates inquiry into all the circumstances surrounding the interrogation, including: the juvenile's age, experience, education, background, intelligence, and whether he had the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. *Id.*

In reviewing a state court conviction, a federal habeas court must presume any factual findings made by the state courts to be correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The statute makes no distinction between the factual determinations of a state trial court and those of a state appellate court, *Perry v. Kemna*, 356 F.3d 880, 883 (8th Cir.), *cert. denied*, 543 U.S. 1022 (2004), and the presumption applies to both implicit and express factual findings of the state courts, *Marshall v. Lonberger*, 459 U.S. 422, 433 (1983); *Weeks v. Snyder*, 219 F.3d 245, 258-59 (3d Cir. 2000). Basic, primary or historical facts in the state court record are entitled to the presumption of correctness. *Collier v. Norris*, 485 F.3d 415, 423 (8th Cir. 2007). Whether a defendant understood *Miranda* warnings is the type of factual issue to which the statutory presumption applies. *Thai v. Mapes*, 412 F.3d 970, 976 (8th Cir.), *cert. denied*, 546 U.S. 1039 (2005).

Here, the circuit court found that Petitioner's statement was inadmissible, in part, because the record did not reflect that the officers took any effort "to insure that the defendant comprehended the consequences of a waiver nor his capacity to comprehend the consequences." (Resp't Ex. 3, at 102-03.) The state supreme court held that the lower

25

court record did not support a finding that Petitioner did not understand the consequences of what he was doing and that, instead, the factors "clearly preponderate[d] in favor of a knowing and intelligent waiver." *Bell III*, 948 S.W.2d at 562. The supreme court discredited Petitioner's "self-serving statement" that he did not understand his rights, noting his educational background, his previous experience with the criminal justice system, the fact that he had been on probation as a juvenile offender, his testimony that he understood the words of the rights-waiver, and his written and verbal acknowledgment to the officers that he understood his rights. *Id.* Petitioner has presented no evidence, much less anything clear and convincing, to rebut this factual determination, relying only on the suppression hearing testimony. Moreover, the Court has carefully reviewed the hearing testimony of Petitioner, the officers, and his parents, as summarized in detail above, and finds that the factual determination is reasonable in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Therefore, the state supreme court's finding that Petitioner understood the rights explained to him is presumed to be correct, as are the state courts' factual statements regarding his background and the general circumstances of the interrogation.

In light of these presumptively correct factual findings, the Arkansas Supreme Court did not unreasonably apply the applicable federal law in determining that Petitioner's waiver was knowing and intelligent.

Furthermore, these findings also support a determination that the waiver was voluntary, *i.e.*, "the product of a free and deliberate choice." *Moran*, 475 U.S. at 421. Again, the Court must consider the totality of the circumstances, including: the degree of any police coercion, such as the use of physical punishment or the deprivation of food or

26

sleep; the length of detention; the length, location and continuity of the interrogation; whether the suspect was advised of his constitutional rights; and the suspect's age, maturity, education, physical condition, level of intelligence and mental health. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The ultimate test is whether the waiver or statement[12] was "the product of an essentially free and unconstrained choice by its maker" or whether "his will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225-26.

Officers may elicit statements by claiming not to believe the suspect's denials. *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001). Tactics such as deception, raised voices, and prolonged questioning do not render a rights-waiver or confession involuntary unless the overall impact of the interrogation caused the suspect's will to be overborne. *Id.* at 1132-33. Moreover, neither a suspect's youth nor the absence of a parent or other friendly adult is dispositive in determining the voluntariness of a juvenile's waiver or confession; it is the totality of the circumstances, rather than the presence or absence of a single circumstance, that determines the voluntariness issue. *Fare*, 442 U.S. at 724-27; *Gilbert v. Merchant*, 488 F.3d 780, 793 (7th Cir. 2007).

The Court has carefully reviewed Petitioner's testimony given at both suppression hearings. (Resp't Ex. 1, at 454-466 [08-30-94]; Resp't Ex. 3, at 377-422 [10-09-96].) There is no evidence of any physical coercion, threats of physical punishment, aggressive

---

[12]The standard for voluntariness of a waiver is the same as the standard for voluntariness of a confession. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986).

exhibition of weapons,[13] or show of force in obtaining Petitioner's waiver.  It is undisputed that the process lasted about five minutes, that Petitioner offered no resistance, and that he was never handcuffed or shackled.   Petitioner testified that he signed the waiver because he was told to do so, was not given any choice, and was "scared" and intimidated because the officers "had authority."  He said the two officers were "constantly confronting" him, saying he was lying and saying "what they think happened."  (Resp't Ex. 3, at 380-82, 409-11.)  In the first hearing, he had testified that Sgt. Allen would get "a little upset," "throw his hands up in the air," and "hit the wall, and desk, stuff like that."  (Resp't Ex. 1, at 457).  He did not say whether this was in connection with the reading of his rights or during the interview itself, and he did not repeat this testimony at the second suppression hearing.

At both hearings, his parents testified about hearing raised voices and sounds of someone hitting the desk or wall, but it is clear from the testimony that this occurred hours after the rights-waiver had been signed.  *See Perry*, 356 F.3d at 886 (police conduct during interview "cannot possibly have any effect on a waiver that precedes that interview").  According to the testimony, officers picked up Petitioner and Sims from Petitioner's grandmother's house "around noon," first allowing them to finish eating lunch.  (Resp't Ex. 3, at 287-288).  Officers then took them to the sheriff's office, where they arrived between 12:30 p.m. and 1:00 p.m.  (*Id.* at 268.)   Petitioner signed the rights-waiver form at 2:45 p.m., which Officer McCord said was shortly after he went in to talk with Petitioner and had him fill out some preliminary paperwork.  (*Id.* at 162, 428.)  Petitioner's mother arrived around  4:30 p.m. and his father about an hour or two later.  (*Id.* at 354, 365).  Thus, there

---

[13] At most, the testimony suggests that one or both of the officers may have been wearing a standard holstered weapon.

was not a prolonged period of detention before Petitioner signed the waiver form.   There is no allegation that he was deprived of needed food, drink or restroom breaks during that period, or that he was "worn down" by continuous, improper interrogation tactics before he signed the waiver.   *See Fare*, 442 U.S. at 726-27.   The evidence is undisputed that McCord read each of the rights to Petitioner and he acknowledged verbally that he understood each one, then initialed each separately.

The testimony was conflicting at both suppression hearings as to whether Petitioner asked to speak with an attorney on January 8.   Petitioner testified that he did so before and after the *Miranda*  warnings, while the officers involved testified that he never requested an attorney.   (*E.g.*, Resp't Ex. 1, at 441, 456-60, 462-63; Resp't Ex. 3, at 163, 177, 206, 213.)   At no point in the circuit or appellate proceedings did any court expressly rule on this issue or was any ruling requested.   Nevertheless, this Court believes that the circuit court's denial of Petitioner's motion to suppress following the first hearing constitutes a rejection of his repeated testimony that he requested an attorney.   As such, the ruling is an implicit finding that Petitioner never invoked his right to counsel on January 8.   *See Marshall*, 459 U.S. at  433-34 (where it is clear that state court would have granted relief had it believed defendant's testimony, the court's failure to grant relief is tantamount to an express finding against the defendant's credibility); *Crespo v. Armontrout*, 818 F.2d 684, 685-86 (8th Cir. 1987) (factual finding that petitioner never invoked right to counsel was implicit in state court's denial of motion to suppress).   By denying Petitioner's motion to suppress, the circuit court necessarily decided to credit the officers' testimony that Petitioner made no request for counsel, and to discredit Petitioner's testimony to the

contrary.  He has not presented clear and convincing evidence to rebut this implied factual determination, and it is reasonable in light of all testimony presented.

In the face of the state courts' presumptively correct express and implied factual findings, and considering the totality of the circumstances, the Court finds that Petitioner's rights-waiver was voluntarily given and that his constitutional rights were not violated in that respect.[14]

F.    Summary.

The Arkansas Supreme Court's decision finding that Petitioner knowingly and intelligently waived his *Miranda* rights was not contrary to or an unreasonable application of clearly established federal law.  In addition, the Court finds that Petitioner's waiver was voluntarily given in accordance with the applicable federal law.  Ground 2 does not entitle Petitioner to federal habeas relief and should be dismissed.

V.
Ground 3

Next, Petitioner argues that the Arkansas Supreme Court's decision finding that counsel was not ineffective for failing to make certain arguments in support of suppression of Petitioner's statements, was contrary to or involved an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  These arguments were presented and decided in Petitioner's Rule 37 post-conviction appeal.  Respondent

---

[14]Because the voluntariness issue was not adjudicated on the merits in state court, § 2254(d)'s deferential standard does not apply to this Court's review of that issue.  *See Pfau v. Ault*, 409 F.3d 933, 938-39 (8th Cir. 2005) (conducting de novo review of federal claim so as to avoid entanglement in state procedural irregularities and give habeas petitioner the benefit of the doubt).

contends that this claim fails to demonstrate entitlement to federal habeas relief under the statutes requiring deferential review of state court decisions.

     A.    <u>Standard for Evaluating Ineffective-Assistance Claims</u>.

Pursuant to well-established United States Supreme Court law, criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant claiming ineffective assistance of counsel must show (1) that counsel's representation "fell below an objective standard of reasonableness," *id.* at 688, and (2) that counsel's deficient performance prejudiced the defendant, *id.* at 687. The defendant is prejudiced by the inferior performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice without resolving the performance element, that course should be followed. *Id.* at 697.

In evaluating an ineffective-assistance claim, *Strickland* directs the reviewing court to presume that counsel's performance "falls within the wide range of reasonable professional assistance" and to further presume that the challenged action "might be considered sound trial strategy." *Id.* at 689. Judicial scrutiny of counsel's performance must be "highly deferential," and events must be viewed from counsel's perspective at the time of trial in an effort to "eliminate the distorting effects of hindsight. *Id.*

In reviewing Petitioner's ineffective-assistance claims, the Arkansas Supreme Court quoted the relevant language from *Strickland* and properly set out its controlling principles. *Bell IV*, *supra* at *1-*2. Petitioner does not identify any factually indistinguishable United States Supreme Court cases, and the Court is aware of none. Therefore, the decisions

31

were not "contrary to" the governing federal law.  Furthermore, for the reasons that follow, it was not objectively unreasonable for the Arkansas Supreme Court to conclude that counsel was not unconstitutionally ineffective under the *Strickland* analysis.

B.      Collective Knowledge and Violation of Ark. R. Crim. P. 4.1(d)

Petitioner's first argument is that defense counsel was ineffective for failing to argue that removal of Petitioner from his grandmother's house on January 8, 1993, constituted an invalid warrantless arrest under Arkansas law because the officers did not personally possess information sufficient to constitute reasonable cause, nor had they been instructed to make the arrest by a police agency which collectively possessed knowledge sufficient to constitute reasonable cause.  *See* Ark. R. Crim. P. 4.1(d) ("A warrantless arrest by an officer not personally possessed of information sufficient to constitute reasonable cause is valid where the arresting officer is instructed to make the arrest by a police agency which collectively possesses knowledge sufficient to constitute reasonable cause.").  (*See* docket entries #2, at 10-12; #20, at 11-14.)

In rejecting this same claim in Petitioner's Rule 37 appeal, the Arkansas Supreme Court stated:

> Appellant goes on to argue that counsel was ineffective for not challenging his confession as a violation of Rule 4.1(d).  For support of this argument, appellant looks to the dissent in [*Bell III*].  There, the dissenters relied on our holding in *Friend v. State*, 865 S.W.2d 275 ([Ark.] 1993) and Rule 4.1(d) to depart from the majority's view.
>
> According to Ark. R. Crim. P. 4.1(d), [a] warrantless arrest by an officer not personally possessed of information sufficient to constitute reasonable cause is valid where the arresting officer is instructed to make the arrest by a police agency which collectively possesses knowledge sufficient to constitute reasonable cause [emphasis added].

[*Bell III*], 948 S.W.2d at 567.  In *Friend*, the arresting officers lacked probable cause themselves and were only instructed to stop the appellant and hold him for questioning.  In that case, we held that no one who possessed probable cause to arrest told the officers who detained the appellant to arrest him; therefore, the arrest was in violation of Rule 4.1(d). [*Bell III*], 948 S.W.2d at 567.

In the instant case, appellant claims that on January 8, 1993, deputies from the sheriff's department not only lacked sufficient knowledge to arrest him, but they did not have instructions to arrest from an officer with sufficient knowledge to constitute probable cause.  "Probable cause exists when there is reasonably trustworthy information within law enforcement's knowledge that would lead a person of reasonable caution to believe that a felony was committed by the person detained."  *Id.* at 561.

In [*Bell III*], we found that there were sufficient facts to constitute probable cause to arrest appellant and that the trial court was clearly erroneous in finding that probable cause did not exist.  *Id.* at 561-62.  The essential facts available to law enforcement on January 8, 1993 were as follows: Sims had lied to police regarding the time he returned a movie to Cloud's Grocery Store on the day of the murders; Sims was at the grocery store when the murders occurred; a .22 caliber pistol was missing from the home of a friend of Sims and was the caliber of pistol used in the murders; appellant told police that he was not with Sims after school on the day of the murders; however, appellant's brother contradicted appellant's story by telling officers that just prior to the murders, Sims came by to pick up appellant and that the two men had discussed returning a videotape and getting a soda; and finally, appellant returned a short time later with a soda.  *Id.* at 561.  Given these facts, we held that:

> [T]his evidence was sufficient to lead a person of reasonable caution to believe that Sims had committed the killings while Bell was present.  Even though "mere presence" does not make one an accomplice [*see* Ark. Code Ann. § 5-2-403 (Repl.1993)], these facts are enough to constitute probable cause to arrest.

[*Bell III*], 948 S.W.2d at 561.  Given our holding, appellant cannot show that the outcome would have been different had counsel challenged appellant's confession for lack of probable cause.  Because appellant has failed to show prejudice, we affirm the denial of relief.

*Bell IV*, *supra* at *3-*4 (parallel citations omitted).

In the state's appeal, as stated, the Arkansas Supreme Court found that facts sufficient to constitute probable cause for Petitioner's arrest were collectively available to law enforcement officers at the time he was directed to be picked up on January 8, 1993. *Bell III*, 948 S.W.2d at 561-62.  The facts cited by the court are supported by the testimony and other evidence in the record.  In view of this holding, Petitioner could not show a reasonable probability that, had counsel challenged admission of his statement due to an alleged Rule 4.1(d) violation, *i.e.*, the lack of probable cause to arrest, his January 8 statement would have been suppressed and the outcome of his trial would have been different.  Therefore, it was not an unreasonable application of *Strickland* for the Arkansas Supreme Court to find that Petitioner had failed to show the requisite prejudice, nor was its decision based on an unreasonable determination of the facts in light of the state court record.  *See Williams v. Locke*, 403 F.3d 1022, 1025-26 (8th Cir. 2005) (where habeas petitioner failed to demonstrate meritorious claim regarding validity of search warrant, no *Strickland* prejudice from counsel's failure to raise the claim).

  C. <u>Failure to Challenge Use of January 5 Statement</u>.

Next, Petitioner contends that counsel was ineffective for failing to challenge use of his January 5 statement to establish probable cause for his subsequent arrest on January 8 (docket entries #2, at 12-13; #20, at 14-16).  While the circuit court held that Ark. R. Crim. P. 2.3 was violated in connection with the January 5 statement, the Arkansas Supreme Court declined to address the merits of this issue in Petitioner's direct appeal, finding that any error was harmless beyond a reasonable doubt because Petitioner did not incriminate himself with the statement he gave on that day.  *Bell III*, 948 S.W.2d at 561.  In Petitioner's Rule 37 appeal, the Arkansas Supreme Court again held that, because the police already

possessed sufficient facts to constitute probable cause for his arrest on January 8, Petitioner was not prejudiced by counsel's failure to make this particular argument as such an argument would have been unsuccessful. *Bell IV*, *supra* at *4.  Here, Petitioner argues that the Arkansas Supreme Court relied on inconsistencies in his January 5 statement to support its finding of probable cause to arrest Petitioner on January 8.  If the January 5 statement had been suppressed, he says, there would not have been sufficient information to support a finding of probable cause.

In Petitioner's January 5 statement, he said he did not see Sims the night of the incident at Cloud's Grocery Store and that he was home all night except that his parents sent him to a different store about 7:30 p.m. to get some sodas and cake.  He said he went straight home afterwards.  (Resp't Ex. 1, at 493.)  In addition to this statement, the Arkansas Supreme Court found that probable cause supported Petitioner's arrest on January 8 due to several facts available to law enforcement at that time: (1) Sims had lied to police about the time he returned a video to Cloud's Grocery Store on the day of the murders; (2) Sims was at the grocery store when the murders occurred; (3) a pistol was missing from the home of Sims' friend, matching the caliber of the pistol used in the murders; and (4) Petitioner's brother told police that, just before the murders, Sims came by Petitioner's house to pick up Petitioner and that the two had discussed returning a video to Cloud's Grocery Store and getting a soda, and that Petitioner returned a short time later with a soda.  *Bell III*, 948 S.W.2d at 561.  The fact that Petitioner's January 5 statement was contradictory to the statement from his brother added little, if anything, to the probable cause equation.  In light of the minimal significance that Petitioner's January 5 denial bore to the probable-cause determination, it was not an unreasonable application of *Strickland*

35

for the Arkansas Supreme Court to find prejudice lacking, nor was its decision based on an unreasonable determination of the facts.

Furthermore, the extensive state court record shows that, as this case wove in and out of the circuit and appellate courts, Petitioner's counsel raised a variety of challenges to his custodial statements.  In fact, one of counsel's arguments at the second suppression hearing was that certain violations in obtaining the January 5 statement tainted any other evidence later procured, including the January 8 statement.   (Resp't Ex. 3, at 296.) Moreover, counsel's performance was sufficient to convince the circuit court to grant Petitioner's motion to suppress both statements.   To render effective assistance, an attorney need not raise every conceivable variation of a particular claim.   While, in hindsight, one argument may have been more persuasive than another, "*Strickland* does not require perfect trial performance; it requires only competence."  *Sherron v. Norris*, 69 F.3d 285, 290 (8th Cir. 1995).   Therefore, this Court cannot say that counsel's failure to raise this additional argument fell below an objective standard of reasonableness.

D.    Failure to Challenge January 8 Warrantless Entry.

Petitioner's next argument  is that counsel was constitutionally ineffective for failing to argue for suppression of his January 8 statement as resulting from an illegal, warrantless, non-consensual entry into his grandmother's house on January 8 for the sole purpose of seizing Petitioner.  He cites *Payton v. New York*, 445 U.S. 573, 576 (1980), which held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."  (*See* docket entries #2, at 13-14; #20, at 16-18.)

The Arkansas Supreme Court rejected this claim as follows:

At the Rule 37 hearing, appellant's brother, Chris Bell, testified that he was present with appellant and Sims at appellant's grandmother's house on January 8, 1993.  Bell testified that they heard a knock at the door, followed by an announcement that the officers were with the Arkansas Sheriff's Department and to open the door.  According to Bell, he opened the door, at which point, the officers entered and asked for appellant and Sims.

In [*Bell III*], we held that there was probable cause to arrest appellant based upon the facts available to law enforcement on January 8, 1993.  Moreover, this court found that because there was probable cause to arrest, the fact that the officers failed to inform appellant that he could refuse to accompany them for questioning was irrelevant.  *Id.*, 948 S.W.2d at 561.  It is evident from our holding in [*Bell III*] that there was nothing improper about the officers' conduct in taking appellant to the sheriff's department for questioning.  Accordingly, any attempt by counsel to challenge such conduct would have been futile.  Absent a showing of prejudice, we affirm the denial of relief.

*Bell IV*, *supra* at *4.

As with Petitioner's previous ineffective-assistance claims, it was not an unreasonable application of *Strickland* for the Arkansas Supreme Court to find that Petitioner was not prejudiced by counsel's omission.  Where the police have probable cause to arrest a suspect – as found by the Arkansas Supreme Court in *Bell III* – the state is not barred from using a subsequent statement obtained at the police station, even though the statement follows an arrest made in violation of *Payton*.  *New York v. Harris*, 495 U.S. 14, 21 (1990).  Nor was the Arkansas Supreme Court's decision based on an unreasonable determination of the facts in light of the state court record.

E.    Failure to Make "Mere Presence" or "Association" Argument.

Next, Petitioner contends that counsel was constitutionally ineffective for failing to argue that his "mere presence" at the crime scene or "association" with Sims was insufficient to establish probable cause to arrest him as an accomplice (docket entries #2, at 14-15, #20, at 18-20).  The Arkansas Supreme Court rejected Petitioner's post-

37

conviction ineffective-assistance claim in this regard for lack of prejudice because, in *Bell III*, the supreme court had specifically concluded that, even though "mere presence" does not make one an accomplice, the facts were nevertheless sufficient to constitute probable cause to arrest.   *Bell IV*, *supra* at *4; *Bell III*, 948 S.W.2d at 561.  Again, where a habeas petitioner fails to demonstrate that there is merit to the claim that he says counsel should have raised, he fails to meet *Strickland*'s prejudice component.  The Arkansas Supreme Court's decision on this issue was not an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts.

F.    Summary.

For the above-stated reasons, Petitioner's ineffective-assistance sub-claims raised in Ground 3 should be dismissed.


VI.
Ground 4

Petitioner's next claim is that the Arkansas Supreme Court's decision that counsel was not ineffective for failing to object to the responses given by three jurors when polled about their verdict, was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Respondent contends that this claim fails to demonstrate entitlement to federal habeas relief under the statutes requiring deferential review of state court decisions.

A.    State Court Proceedings and Decision.

The trial transcript shows that, following the jury's verdict, the trial judge individually polled the jurors at the request of Petitioner's counsel, asking them, "[I]s that your verdict?

Guilty of First Degree Murder?"  The judge then called out the name of each juror, allowing them to respond.   According to the transcript, two of the jurors did not give verbal responses, and a third (Carnetta Holloway) responded, "Finally."  (Resp't Ex. 1, at 2268-69.)   In Petitioner's Rule 37 hearing, the judge who presided over the trial testified that he had called the roll and observed all twelve jurors affirm the verdict.  He said there were two non-verbal responses from jurors who affirmed by head movements.   The judge also testified that, if the jurors had not nodded their heads affirmatively, he would not have proceeded and would have sent them back to reach a verdict.  (Resp't Ex. 6, at 771-73.) He said that, because the court reporter's back was to the jury, she could not see the jurors or hear some of their responses.  (*Id.* at 776, 779.)  Petitioner's two trial attorneys testified that they did not observe anything from the jurors indicating the verdict was not unanimous, and that each juror either said yes, nodded his or her head affirmatively, or spoke in a soft voice which the court reporter may not have heard.  (*Id.* at 695-97, 764-66.)  One attorney testified that he looked at each juror as he or she responded and "would not have let that matter [go] a step further without objection" if he had seen any indication that guilt was not their verdict.  (*Id.* at 695-96.)   Based on this evidence, the Rule 37 court found that counsel's performance was not deficient and that there was no reasonable probability that, if counsel had demanded audible responses, the outcome of the trial would have been different.  (*Id.* at 249-52.)  As to Ms. Holloway's answer of "Finally," the court specifically stated at the hearing that he saw no ambiguity in her response and that it simply meant she arrived at her verdict "finally."  The judge stated, "[I]n plain English it is very simple what finally means ... [it] means that you have finally arrived at that conclusion, decision, position, or whatever it may be."  (*Id.* at 754-755.)

The Arkansas Supreme Court affirmed as follows:

> Appellant argues that the jury's verdict was not unanimous; therefore, counsel should have lodged an objection.  However, based upon the jurors' responses at the time, and according to testimony, there was no indication to the court or counsel that the jury was not in agreement that appellant was guilty.  When polled, two jurors affirmed the verdict with head nods, and a third stated, "Guilty, finally."  Although at the hearing, this particular juror stated that her response of "Guilty, finally" was not an affirmation of the verdict, the plain meaning of the words suggested to counsel and the court that she agreed with the verdict.  We affirm the ruling below.

*Bell IV*, *supra* at *5.

B.    Petitioner's Argument.

Petitioner contends that counsel had a duty to ascertain with certainty that the jurors were in agreement and that he should have asked follow-up questions of the three jurors in question, or asked the court to repeat the polling or force the jurors to respond.  He says that Ms. Holloway's response was "completely ambiguous" and that, at the Rule 37 hearing, she testified that she never intended to vote guilty.  Here, he submits an affidavit from her (docket entry #22), stating that she intended to vote guilty for robbery, not murder, and that the only thing the state proved to her was that Petitioner was present when Sims committed these murders.  She says she was "pressured and tricked" into voting guilty and that she now wants to "make [her] wrong right."  (*See* docket entries #2, at 15-16, #20, at 20-22.)

C.    Analysis.

As stated, the Rule 37 court credited the testimony of Petitioner's attorneys and the trial judge that all jurors affirmed the guilty verdict as their verdict and that, if there had been any uncertainty, action would have been taken.  The Rule 37 judge also expressly stated that he saw no ambiguity in Holloway's response.  These are factual determinations

that must be presumed correct under § 2254(e)(1).   Questions which turn on determinations of demeanor and credibility are peculiarly within a trial judge's province and are thus entitled to deference by a reviewing court.  *Uttecht v. Brown*, 127 S. Ct. 2218, 2224 (2007); *Wainwright v. Witt*, 469 U.S. 412, 428 (1985).   The trial judge and both of Petitioner's attorneys felt certain, upon observing the demeanor and non-verbal communications of the three jurors, that they were all voting in favor of a guilty verdict. Similarly, the judge at the post-conviction hearing listened to the testimony of the attorneys and the trial judge, finding it to be credible, and he considered the testimony of Ms. Holloway.  These are precisely the types of factual determinations that a federal habeas court must presume to be correct.

Moreover, Ms. Holloway's affidavit, which is essentially an expansion of her proffered testimony at the Rule 37 hearing, (*see* Resp't Ex. 6, at 751-59), does not constitute clear and convincing evidence to rebut the presumption of correctness.  "By the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict."  *Tanner v. United States*, 483 U.S. 107, 117 (1987).   In the absence of an "extraneous influence" allegedly affecting the jury, the testimony of a single juror will not be permitted to impeach a verdict.  *Id.*  "After a jury has given its verdict, has been polled in open court and has been discharged, an individual juror's change of mind or claim that he was mistaken or unwilling in his assent to the verdict comes too late." *United States v. Schroeder*, 433 F.2d 846, 851 (8th Cir. 1970).

Therefore, in determining that counsel was not ineffective for failing to object to the three jurors' responses, the Arkansas Supreme Court did not unreasonably apply the

41

principles enunciated in *Strickland* or any other clearly established federal law, nor was its decision based on an unreasonable determination of the facts in light of the state court record.  Ground 4 should be dismissed.

VII.
Ground 5

Finally, Petitioner argues that the Arkansas Supreme Court's decision that counsel was not ineffective for waiving Petitioner's statutory right to have the jury's questions addressed by the trial judge in the courtroom, was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Respondent contends that the supreme court's decision is entitled to deference under § 2254(d).

A.    State Court Proceedings and Decision.

Under Arkansas law, if there is a disagreement or if the jurors wish to be informed on a point of law, they must be brought into open court to receive the requested information or instruction.  Ark. Code Ann. § 16-89-125(e).  During deliberations at Petitioner's trial, the jury sent the judge two questions.  The first was, "We have one juror that does not agree with the law, that if [Petitioner] was there he is guilty of murder by helping with the robbery.  What do we do now?"  (Resp't Ex. 1, at 2262.)  The second question read, "As far as First Degree Murder, Second Degree Murder, what are the prison terms for these two?"  (*Id.* at 2265.)  The judge asked both attorneys if they wanted the jury brought into the courtroom for further instructions.  Both attorneys waived bringing the jury into open court and instead agreed upon the wording of the responses to the jury.  To the

42

first question, the agreed response was, "Continue deliberations.  The verdict must be unanimous."  The response to the second question was, "Per instructions, the punishment is not to be considered in determining guilt."  (*Id.* at 2262-67.)

In its order denying relief, the Rule 37 court found that strict compliance with the procedural requirements of § 16-89-125(e) may be waived and that the record of the proceedings showed no prejudice to Petitioner.  (*Id.* at 249-52.)  In the Rule 37 appeal, the Arkansas Supreme Court addressed the issue as follows:

> When additional instructions are to be given, the jury must be called into the courtroom, with counsel present or having been notified.  *Tarry v. State*, 710 S.W.2d 202, 204 ([Ark.] 1986).  Moreover:
>
> > Although we have not held, and do not intend to hold, that this right of defendant cannot be waived, we take this means of giving notice that we will carefully scrutinize every case tried after the date of our decision in [Martin v. State, 497 S.W.2d 268 (Ark. 1973)] ... to determine whether there has been a waiver of defendant's right to have such proceedings held only in open court, and that all reasonable doubts will be resolved by us against waiver.
>
> *Tarry*, *supra*.  In the *Martin* case, we held that strict compliance with the statute was waived where the attorneys went with the judge into the jury room, everything that happened was reported in the record, and there was no possibility of prejudice.  *Tarry*, 710 S.W.2d at 204-05.  We have also held that noncompliance gives rise to a presumption of prejudice and that the State has the burden of overcoming this presumption.  *Id.* at 205.
>
> In the case of *Atkinson v. State*, 64 S.W.3d 259 ([Ark.] 2002), we held that the trial court did violate Ark. Code. Ann. § 16-89-125(e) by communicating with the jury other than in open court; however, reversal of Atkinson's conviction was not warranted because the State rebutted the presumption of prejudice.  In that case, the record clearly reflected the substance of the trial court's communication with the jury, and the court answered the jury's questions in a manner agreed upon by the parties in open court. *Id.* at 269. Moreover:
>
> > To reverse this case on these facts would place form over substance and would in effect adopt a brightline rule which would require an automatic reversal merely by showing § 16-89-125(c) had been

43

> violated. That is not the rule. Here, the court's communication with the jury was shown not to be prejudicial to Atkinson, and Atkinson made no objection to the contrary. Thus, we affirm the trial court on all points.
>
> *Id.* at 270. In the instant case, upon hearing the questions raised by the jury, both attorneys and the judge engaged in a discussion on how to respond and elected to communicate with the jury via notes, much like the *Atkinson* case. Because appellant's counsel was present in deciding the language of the notes and because there was no communication between the judge and jury outside of the presence of counsel, there is no showing of prejudice. Moreover, even if the jury's questions had been answered in open court, it is likely that the verdict would have been the same. Therefore, we affirm the trial court's denial of relief.

*Bell IV*, *supra* at *5-*6 (parallel and internal citations omitted).

B.   Petitioner's Argument.

Here, Petitioner contends that counsel should have taken every measure to assure that Petitioner's rights were protected and that each query by the jury was "a critical question at a critical stage of the trial." In particular, he says that the first question showed that one juror was not convinced that the state had proved its case and was not wanting to vote guilty. Petitioner argues that defense counsel should have requested that the jury be brought back into the courtroom to ensure that the juror was "comforted" and to reiterate the instruction that the jury must be convinced beyond a reasonable doubt. (*See* docket entries #2, at 16-17; #20, at 22-26.)

C.   Analysis.

The Arkansas Supreme Court did not unreasonably apply the *Strickland* principles, nor was its decision based on an unreasonable determination of the facts. The trial judge and defense counsel took care to ensure that the jury's questions were properly addressed in a manner agreed upon the parties, which is sufficient under Arkansas law to waive the

44

statutory requirement.   Moreover, nothing in the record demonstrates a reasonable probability that, had the questions been answered in open court, the outcome of the trial would have been different.   Ground 5 should be dismissed.

VIII.
Conclusion

For the above-stated reasons, this 28 U.S.C. § 2254 petition for writ of habeas corpus (docket entry #2) should be **dismissed in its entirety with prejudice**.

DATED this 6th day of September, 2007.


_____
UNITED STATES MAGISTRATE JUDGE